GUENTHER, APPELLEE, *v.* DOWNTOWN MERCURY, INC., ET AL., APPELLANTS.*

---

*Motion to certify the record overruled, April 30, 1958.

(No. 8327—Decided January 6, 1958.)

*Messrs. Wise & Brose,* for appellee.

*Mr. Albert H. Neman,* for appellant Downtown Mercury, Inc.

*Mr. Wm. B. Peterman,* for appellant Universal C. I. T. Credit Corporation.

MATTHEWS, J.   This is an action seeking reformation of a contract for an automobile and an accompanying chattel mortgage and an insurance policy, and for judgment for money upon the instruments, as reformed.

All the defendants deny the allegations upon which the plaintiff relies as his cause of action, and the defendants, other than Connecticut General Life Insurance Company, by cross-petition pray for judgment for money on the unreformed chattel mortgage.   These issues were tried to the Common Pleas Court without a jury, and, at the conclusion of the trial, the court found the issues in favor of the plaintiff and granted the relief for which he had prayed.   That is the judgment from which this appeal on questions of law was taken.

The plaintiff's son, Sherl Guenther, applied to the defendant Downtown Mercury, Inc., for the purchase of an automobile.   The negotiations progressed to the point where Sherl made a payment of $200 and gave a note for $500, payable two days after date, on account of the purchase price, and was given possession of the automobile pending the final consummation of the sale which was to take place within two days thereafter.

The note was to be paid on the completion of the sale, thereby making the cash payment $700, and the remainder was to be paid in monthly installments, secured by a chattel mortgage upon the automobile. Without doubt, at this first meeting, Downtown Mercury, Inc., raised the question of Sherl's ability to meet the monthly payments of $87.05, and that was the reason for postponing the consummation of the sale, so as to give Sherl time to satisfy Downtown Mercury, Inc., that the obligation for the balance of the sale would be met. It is a fair inference that both parties contemplated that the security would be strengthened by having Sherl's father obligate himself in some way to the payment of the unpaid balance.

Pursuant to this plan, the plaintiff, his wife, and Sherl went to the place of business of Downtown Mercury, Inc., and executed the documents which the plaintiff seeks to have reformed. These documents consist of a chattel mortgage and power of attorney, and these were executed in duplicate. These documents were signed by the plaintiff, and under his name was the signature of his son, Sherl Guenther. In addition, the plaintiff signed a so-called Universal C. I. T. customer's statement. The chattel mortgage and power of attorney were on printed forms, with blank spaces, and it appears that the plaintiff and his son signed before the blanks were filled in, but that fact is not material, as no question is raised as to whether the blanks were properly filled in accordance with the intent of the parties. As signed and filled in, there is no ambiguity or uncertainty in these written documents. They show that the plaintiff and his son purchased this automobile jointly, executed this chattel mortgage jointly, became bound jointly, and, as to the defendant Downtown Mercury, Inc., became equally liable to discharge the debt.

But the plaintiff asserts that it was understood that he was to be only a surety for his son and he was to have no title to the automobile. Analyzing the conversation which took place at the time of this purchase, we find some evidence to support that position. However, in our opinion, the record does not contain that clear and convincing evidence which is required to nullify a written contract into which the parties have integrated their contract. Regardless of whether the writing could be re-

formed between the original parties, there are others who would be affected, and that raises other questions.

The parties contemplated that the life of one or both of the mortgagors would be insured to the extent of the unpaid balance, so that in the event of death, the unpaid balance would be paid by the insurer. The printed form contained a provision to that effect. Under the printed, bold-type heading, "Designation of Insured," there was this printed statement: "For insurance, if any, to be obtained in connection herewith—customer designates as to the person to be covered the individual whose signature on behalf of the customer first appears below." The first signature below is that of the plaintiff, and under his signature appeared in print this statement: "Person to be insured as above."

Downtown Mercury, Inc., in accordance with what appears to have been usual, immediately thereafter assigned this chattel mortgage to Universal C. I. T. Credit Corporation, and insurance on the life of the plaintiff was taken out with Connecticut General Life Insurance Company, as required in the chattel mortgage.

There is evidence that, before this sale was made, Downtown Mercury, Inc., submitted the credit risk to Universal C. I. T. Corporation, but there is no evidence as to whether the credit risk was as to the plaintiff or Sherl, excepting a financial statement made by the plaintiff upon a form provided by Universal C. I. T. Corporation. Whether this was the basis upon which it accepted the risk does not appear. There is no evidence whatsoever that Connecticut General Life Insurance Company had any knowledge whatsoever about any alleged mistake when it accepted the plaintiff as the insured.

Sherl Guenther died within a month of this purchase, and then, for the first time, was it asserted that this life insurance should have been taken on his life and not on the life of his father. To accomplish this, the plaintiff alleged, and was obliged to prove, that Connecticut General Life Insurance Company had knowledge of this mistake at the time it accepted the insurance. There is a claim that the business relation between these three defendants, as shown by the evidence, was very close, and the evidence does so prove, but there was a point

where their interests diverged—and a close relationship is no proof of authority to bind the others by contract. They were three independent business corporations—each pursuing its own business, in its own field.

We find no evidence that Connecticut General Life Insurance Company participated in any way in this transaction at or prior to the execution of this chattel mortgage, and thereafter its only connection was to issue a policy upon the life of the plaintiff in accordance with the terms of the chattel mortgage.

The case then reduces itself to the question of whether this chattel mortgage should be reformed so as to substitute Sherl Guenther for the plaintiff as against Connecticut General Life Insurance Company, so as to charge it with the obligation to pay the mortgage debt, notwithstanding it had no notice of the alleged mistake and had no intention to issue a policy upon the life of Sherl Guenther.

Assuming that there was a mutual mistake by the plaintiff and Downtown Mercury, Inc., and that the instruments could be reformed as to them, that reformation could not be made as against the other defendants who were not parties to the mistake and who had no notice of it. Their contracts cannot be reformed because of a mistake in the contract between the plaintiff and Downtown Mercury, Inc., even though equity would reform the instrument as between them.

In 76 Corpus Juris Secundum, 409, Section 59, the rule is stated that: "An instrument may not be reformed as against a subsequent bona fide purchaser for value without notice." And, in 35 Ohio Jurisprudence, 152, Section 10, it is said, more broadly, that: "It is an almost universally established rule that while a court of equity will reform a deed * * * contract, or other instrument and will make the instrument conform to the intention of the parties, reformation or correction will not be made if it appears that it will prejudice the rights of bona fide and innocent purchasers or of subsequent encumbrancers for a present consideration." See, also: 45 American Jurisprudence, 624 *et seq.*, Section 68 *et seq.*, and *Haverstick* v. *Beaver,* 34 Ohio Law Abs., 363, 37 N. E. (2d), 650.

And the burden of proving that the subsequent purchaser

had notice of the mistake at the time he became a purchaser rests upon the litigant seeking the reformation.

In the text of Section 112 in 45 American Jurisprudence, 649, it is stated, that: "The party seeking reformation has the burden of showing that a subsequent purchaser or encumbrancer acquired his right with notice of the equity of reformation."

Regardless of the burden of proof, there is no doubt that equity acts sparingly in the reformation of written documents executed by parties, and only when the proof is of a very high degree. This is particularly so when the rights of third persons have intervened.

We, therefore, find that the court erred in overruling the defendants' motion for judgment.

For these reasons, the judgment is reversed, and final judgment will be entered for the defendants.

*Judgment reversed.*

HILDEBRANT, P. J., concurs.

LONG, J., dissenting. This case is on appeal on questions of law from the Court of Common Pleas of Hamilton County.

As I read the record made below, I can not agree with the majority opinion. The facts are as follows: Sherl Guenther, son of the plaintiff, on November 6, 1954, purchased from Downtown Mercury, Inc., an automobile and paid $200 cash and gave his note for $500, payable in two days, the balance of the purchase price to be financed by a note and mortgage. Under this arrangement, surrender of possession of the automobile was made to Sherl.

Defendant Universal Credit Corporation was the regular finance company handling the paper of Downtown Mercury, Inc., and to which it submitted the proposed deal between Sherl Guenther and it. When the finance company discovered that the balance of the purchase price, plus carrying charges, might exceed $2,600, it insisted that Sherl Guenther, who was only 24 years old, would have to give additional security. On November 8, 1954, two days later, Sherl appeared at the offices of Down-

town Mercury, Inc., with his mother and his father, William H. Guenther, plaintiff-appellee, who offered to co-sign the note and mortgage for the benefit of his son. The $500 note was paid at this time. William H. Guenther, the father and co-signor, together with his son, the undoubted purchaser of the car, went to the offices of the seller of the automobile, realizing that various papers must be signed in order that Sherl might secure title to the car he had purchased. The record is replete with evidence that the father and son put themselves under the complete guidance of agents of the seller of the automobile, with instructions from the finance company as to what was to be done to satisfy the finance company. It was at this meeting of November 8th that the son and father were advised of the practice on the part of the finance company requiring life insurance on the life of a purchaser in particular cases; that because of the age of the son Sherl, the finance company wanted insurance on his life, so that if Sherl should die before the final payment on the purchase price, there would be funds payable on the policy to take care of the balance, all for the benefit of the father; thereupon, representatives of the Downtown Mercury, Inc., carrying out instructions from the finance company, and attempting to accomplish its purposes, including the preparation and signing of the necessary documents, procured the father to sign, as, they labelled him, "co-purchaser"; he was also made co-maker of the note and mortgage. Solely through inadvertence, the father, instead of the son, was made the insured on the policy of insurance, which, in my opinion, constituted a mutual mistake. Within a few weeks of the closing of the transaction in question, the son, Sherl, was killed in an automobile accident, causing claim to be made against the insurance company.

As I read this record, the Connecticut General Life Insurance Company had no interest in the transaction except to insure a purchaser of an automobile who was satisfactory to the seller. The insurance company made no physical or other examination of the insured. Whatever the finance company did, or who was to be insured, was a matter of indifference to the insurer; the insured, so far as the insurance company was concerned, might be suffering from cancer and have only six

months to live, and yet it would pay the balance due on the mortgage upon the death of the purchaser. According to the logic of the finance company and the insurance company, both the father and son should have been insured, because they are both purchasers. The clear intention of the parties, according to the record, as I read it, was that the purchaser was to be insured; all the papers—certificate of title, note and mortgage—indicate the son and father as purchasers; in one place the father is designated as ''co-purchaser.''

I have examined Ballentine's Law Dictionary, Corpus Juris, American Jurisprudence, and the Standard Dictionary, and nowhere can I find the word ''co-purchaser.'' Why was the father so designated? The only possible reason is that all the parties recognized the son as the real purchaser, the father being merely a secondary obligor. If the son didn't pay, the father would. If the son died, the insurance on his life would pay the balance due.

Now let us examine the evidence.

Sprosty, Downtown Mercury salesman, testified that after he had discussed the Sherl Guenther deal with his boss, Cantrell, he was told to take the $200 and get the father as co-signer. ''They wanted Mr. Guenther (meaning the father) to be the co-signer.''

Sansone, representing Downtown Mercury at the closing on November 8, 1954, testified: ''I was supposed to sign Mr. Guenther (father) as co-signer. * * * I had him sign as co-signer on his son's new car. * * * Mr. Guenther was co-signer—his boy was the owner.'' He also testified that he said to Sherl: ''You are lucky to have a dad sign for you.'' He also testified that the father said at the closing: ''This is for the boy to have his name on the deal and Guenther, Sr., is just a co-signer.'' He further offered in evidence the following: ''I told both of them, the boy and Mr. Guenther—*when a car is sold, anything should happen to the boy the car is automatically paid for.*'' (Emphasis added.) This is the same understanding as testified to by Mrs. Eleanor Guenther, the mother, who was also present at the closing of the deal; the father's testimony was the same.

Was this not the real undertaking of the parties? ''If any-

thing should happen to the boy, the car is automatically paid for." What difference does it make that the father's and the son's names were transposed, so as to make it appear that the insurance company was to insure the father? I am wondering what position the insurance company would have taken, *if the father had died* and the son would have made claim that the balance of the purchase price remaining unpaid should be paid by the insurance company.

It further appears from the record that the proposed financing of the Guenther deal had been submitted to the finance company, and that the finance company gave express instructions to Downtown Mercury, Inc., as to paying the $500 note, having the father sign as co-signer, and the usual insurance on the life of the real purchaser, the son. There appears further to be a general contractual relation between the finance company and the life insurance company, that, when the finance company so desires, the insurance company would accept insurance on the life of a purchaser, no questions asked. This is the situation which existed pending the concluding of the Guenther deal. Is not the insurance company bound, under these facts, by the mistakes made by its agent, the Finance Company, which is expressly authorized to solicit insurance under such circumstances. It seems clear that the finance company in such cases is the agent of the insurance company. The statutes of Ohio (Sections 3911.22 and 3929.27, Revised Code), make the finance company the agent of the insurance company. Are not the mistakes of the finance company, under such circumstances, the mistakes of the insurance company? Notice to the finance company is notice to the insurance company.

What is a mutual mistake? In 45 American Jurisprudence, 618, Section 56, "mutual mistake" is defined as "one which is reciprocal and common to both parties, each alike laboring under the same misconception in respect to the terms of the written instrument." Applying this to the case at bar, all the parties were of the belief that the boy was the primary obligor, and that it was his life that was to be insured. It is no answer to say that the insurance company did not have notice. The insurance company didn't care; it accepted any insurance solicited for it by its agent, the finance company.

As to the character of the evidence requiring reformation, it seems clear, satisfactory, and convincing to me that nobody having to do with the Guenther deal had any other understanding than that the boy's life was to be insured.

I think the evidence is clear that the insurance company authorized the finance company, in this case, to do whatever was necessary to consummate the deal between Sherl Guenther, his father, the seller of the automobile, and the finance company as to insurance. That was the service which the insurance company rendered to its solicitor-agent, the finance company.

Sherl Guenther bought an automobile which had to be financed through the credit corporation and the credit corporation had an understanding with the insurance company that the insurance company would insure the life of any purchaser of an automobile for the balance of the purchase price due, in any case acceptable to the finance company. The Sherl Guenther deal was such a case. He paid $700 of his own money as the down payment on the car, his father was to sign as co-signer any papers prepared by the finance company, and insurance was to be taken out on the life of the boy, not the father. What was the element of chance which was to be insured? It was the youth, inexperience and lack of financial substance of the son. There would have been no sense in insuring the father; all the parties accepted the father's financial stability. The only doubt of the finance company was the likelihood that the son might not pay. That was the only event against which the insurance was issued, and nothing else. That was everybody's understanding. The agents of the finance company, through mistake and inadvertence, had the father sign the chattel mortgage on the line reserved for the purchaser or primary debtor and the son signed the chattel mortgage on the line reserved for the co-signer. As a result of this, the policy was issued on the life of the father instead of the son. All of the witnesses who knew of the understanding between the parties testified that the Guenthers, Downtown Mercury, Inc., and the finance company, who solicited the insurance, knew that the insurance on the life of the father was a mistake—one made by all the parties, a mutual mistake. No, the insurance company didn't know that the son, instead of the father, was to be the insured, but its

agent, the finance company, through its representatives knew that Sherl Guenther was to be insured, and not his father. What better evidence could there be of a mutual mistake? What better notice thereof to the agent of the insurance company? Notice to the principal is not necessary when the agent is doing expressly what he is authorized to do.

It is my opinion that the judgment should be affirmed.