PRINTING INDUSTRIES ASSOCIA-
TION OF NORTHERN OHIO,
INC., et al., Plaintiffs,

v.

INTERNATIONAL PRINTING AND
GRAPHIC COMMUNICATIONS UN-
ION, LOCAL NO. 56, et al., Defendants.

Nos. C83–127 to C83–130.

United States District Court,
N.D. Ohio, E.D.

Jan. 27, 1984.

Michael T. McMenamin, William Gorenc, Jr., Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, for plaintiffs.

Stanley D. Gottsegen, Burke, Haber & Berick, Cleveland, Ohio, for defendants in Nos. C83–127, C83–128 and C83–129.

Lawrence M. Oberdank, Reimer, Oberdank & Cowan, Cleveland, Ohio, for defendant in No. C83–130.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

This matter is before the Court on cross-motions for summary judgment. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted only if the court, viewing all the evidence in the light most favorable to the opponent of the motion, concludes that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976); *Tee-Pak, Inc. v. St. Regis Paper Co.*, 491 F.2d 1193 (6th Cir.1974). For the reasons outlined below, the Court denies the cross-motions filed in this case.

### I.

On January 7, 1983, the plaintiffs, Printing Industries Association of Northern Ohio, Inc. (PIANO), a multi-employer bargaining association, filed suit simultaneously against defendants, four unions representing printing industry employees in the Greater Cleveland area. Jurisdiction was alleged under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. In their suits, plaintiffs sought reformation of the Cost Of Living Allowance (COLA) provisions contained in the collective bargaining agreements into which PIANO had entered with each union. Arguing that the parties made a mutual mistake in adopting the language used in the contracts and that the language so chosen failed to reflect the parties' mutual intent in drafting the COLA provisions, the plaintiffs asked to be relieved of their obligations under the COLA provisions of each collective bargaining agreement. The defendants each filed answers denying that reformation was available to the plaintiffs.

On March 22, 1983, the defendants moved for a preliminary injunction requiring PIANO to pay into an escrow account the cost of living increases mandated by the collective bargaining agreements or, in the alternative, to pay a cost of living increase calculated pursuant to the National Consumer Price Index for Urban Wage Earners and Clerical Workers, new series 1967 = 100 (National CPI–W) to their employees and to place into an escrow account the balance between the National CPI–W and the Consumer Price Index for Urban Wage Earners and Clerical Workers, new series for Cleveland, Ohio 1967 = 100 (Cleveland CPI–W) due under the contract.[1]

**1.** The COLA payments due under the four contracts were computed semiannually, based upon the Cleveland CPI–W figures released for April and October of each year. PIANO made no COLA increase in the wage rates of the Unions' employees after April 1982, and the preliminary

Before the Court ruled on defendants' motion, the parties entered into a consent agreement. Under the consent agreement the cases were consolidated for all further matters, the plaintiffs paid employees a cost of living allowance due in accordance with the National CPI–W, and the plaintiffs established escrow accounts into which they would deposit the disputed COLA, the amount by which the Cleveland CPI–W exceeded the National CPI–W, until a final order was entered in the consolidated cases. Order, *Printing Industries Association of Northern Ohio, Inc. v. International Printing and Graphic Communications Union, Local No. 56*, C83–127, –128, –129, –130 (N.D.Ohio April 25, 1983).

Thereafter, the defendants moved for summary judgment, arguing that the matters in dispute were properly subject to arbitration under the respective arbitration clauses of the collective bargaining agreements. This Court, however, ruled on July 13, 1983 that the question of reformation of the collective bargaining agreements was not within the jurisdiction of the arbitrator and that the arbitrator thus could not adequately arbitrate the disputes presented. 578 F.Supp. 555. Following the Court's ruling, the parties filed the cross-motions for summary judgment that are before the Court today.

II.

The dispute in this case results from the divergence that has occurred since 1982 between the National CPI–W and the Cleveland CPI–W. To understand fully the issue presented, it is necessary to discuss briefly the two indices and their history.

The U.S. Bureau of Labor Standards (Bureau), a division of the U.S. Department of Labor, compiles, calculates, and publishes an "All Cities" Consumer Price Index known as the National CPI–W. Starting with a base reference index of 100.0 for the year 1967, the National CPI–W measures the increases or decreases in consumer prices resulting from inflation for goods and services purchased by urban wage earners and clerical workers throughout the United States. The index is based upon the price changes of 400 items, which have been grouped into seven major categories: food and beverages; housing; apparel; transportation; medical expenses; entertainment; and other. Prices for the items are obtained from numerous establishments in the urban portions of thirty-nine major metropolitan areas and seventeen smaller cities chosen by the Bureau to represent all urban areas in the United States.

The U.S. Bureau of Labor Statistics also compiles, calculates, and publishes indices for twenty-eight individual urban areas, of which Cleveland is one. The Cleveland index is based upon the price changes in the same 400 items comprising the National Index, but obviously is based upon a smaller number of sales of each item. Therefore it is more prone to statistical distortion.

The National CPI–W and the Cleveland CPI–W remained relatively comparable until the Bureau published its June 1982 figures. Prior to that date, the average variance in the indices was 3.7 points. Beginning in June 1982, however, the Cleveland index began to rise disproportionately to the National index. In August 1982 the Cleveland index was 17.9 points above the National index, and as of February 1983 the Cleveland index remained 21.5 points above the National index.

The plaintiffs have introduced the affidavit of Dr. John F. Burke, Jr., Associate Professor of Economics at Cleveland State University. Dr. Burke states that the divergence between the Cleveland CPI–W and the National CPI–W is due not to a higher inflation rate in the Greater Cleveland area, but rather to the inherent instability occasioned by the use of an indicator compiled through a small sampling field.

Specifically, Dr. Burke identifies the cause of the distortion to one component of

injunction sought by the employees was based upon the COLA increases due for the past peri-

ods.

the indices, housing. The housing component consists of samples of three items: fuel, household furnishings, and shelter. The shelter subcomponent is further divided into rent, other rent, and home ownership. Dr. Burke notes that while the home ownership subdivision of the National CPI–W declined in 1982, it rose in the Cleveland CPI–W. He ascribes the rise not to the fact that the actual price of a home in the Greater Cleveland area increased over the period in question. Rather, Dr. Burke states, so few home sales in the Greater Cleveland area occurred over the relevant period that the U.S. Bureau of Labor Standards expanded the geographical reach of its sample beyond the Greater Cleveland area. In so doing, the Bureau recorded sale prices higher than those normally encountered in the Greater Cleveland area. These higher prices resulted in a rise in the homeownership figure, and the increase affected the entire Cleveland CPI–W. In addition, Dr. Burke emphasizes that the average cost of housing has not in fact risen in the Cleveland area.[2]

### III.

As previously stated, the dispute in these matters involves the COLA provisions of collective bargaining agreements entered into between PIANO and the four Union defendants. The Court will now briefly describe the COLA provision in each agreement.

A. *Local No. 56, International Printing and Graphic Communications Union.* The COLA provision within the Local 56 contract, which provides for a two cent per hour cost of living adjustment for each one-point increase in the Cleveland CPI–W, was first negotiated and incorporated in a Local 56 Contract in 1976. Local 56 proposed a COLA clause in the negotiations for the 1976 contract, submitting for consideration two different kinds of language offered by their International Union. PIANO, however, refused to accept the Local's proposals and offered instead the COLA language that PIANO had previously included in the contract between plaintiffs and the Graphic Arts International Union (GAIU), *see infra.* The GAIU COLA provision was based on the Cleveland CPI–W, and, as such, the Cleveland CPI–W was incorporated into the Local 56 contract.

In deposition testimony, Mr. Philip H. Boehnlein, Secretary-Treasurer of Local 56 and the Union's chief negotiator in its negotiations with PIANO, stated that the Local's chief interest in having a COLA provision in their contract was that GAIU had successfully bargained for a COLA provision in their PIANO contract and that Local 56 wished to gain the same benefits that the GAIU had been granted. Mr. Boehnlein admitted that he never questioned the accuracy or reliability of the Cleveland CPI–W during the negotiations and that the Union has retained a COLA provision in their contracts since 1976 to keep the members' wages from being eaten away by inflation.

B. *Local No. 546, (Lithographers) Graphics Arts International Union.* A COLA provision was first integrated into the Local 546 (Lithographers) Contract in 1973. At that time, the Union felt that it was falling behind in the cost of living and wanted to keep real wages from being eroded by inflation. Mr. George Bockman, president of the Union and chairman of the Union's negotiating team, in deposition testimony recalled that the then-president of PIANO, Mr. Neil Johnson, suggested that the Cleveland CPI–W be used. Mr. Bockman stated that the Union had no argument with the use of the Cleveland CPI–W. Mr. Bockman stated that the Union's main

---

**2.** Additionally, the plaintiffs note that in January 1983, the U.S. Bureau of Labor Standards issued a news release stating that local area CPI indices were more volatile due to their smaller sampling sizes and urged users of indices to adopt the National CPI for use in escalator clauses. Plaintiffs argue that this fact shows the unreliability of the Cleveland CPI–W. Further they argue that the parties could not have foreseen that such a divergence could have occurred when they originally agreed to the use of the Cleveland index since the U.S. Bureau of Labor Statistics did not note the problem itself until early in 1983.

goal was to obtain some cost of living adjustment and that it did not contest the actual scale used. Although Mr. Bockman stated that he never had reason to question the accuracy or reliability of the Cleveland index, he felt unable to substantiate whether in 1973 he thought that the Cleveland index would more accurately reflect the cost of living in Cleveland than would the National index.

C. *Local No. 546, (Bookbinders) Graphic Arts International Union.* A COLA provision has been included in Local 546 (Bookbinders) Contract between PIANO and the Union since approximately 1972. The COLA provision in the contract granted differing increases per change in the Cleveland CPI–W according to employee job classification. In deposition testimony, Mr. Robert Hudeck, Secretary-Treasurer of the Union and chief Union spokesman during contract negotiations, stated that he was not a member of the Union negotiating team that participated in the contract discussions when a COLA provision was discussed and first incorporated into a PIANO-Union Contract, and thus was unable to furnish any information as to the parties' original intentions and beliefs. Mr. Hudeck did discuss the COLA provision in 1981 with PIANO representatives, however, during negotiations for the present contract. During those negotiations PIANO put forth different proposals, including lowering the COLA, eliminating the COLA and granting a wage increase, or incorporating a COLA with a cap. The Union, however, refused to change the COLA provision present in the last Union contract. Mr. Hudek stated that his desire to retain the COLA was to keep his members' wages even with inflation. In addition, Mr. Hudek stated that neither party during the 1981 negotiations ever questioned the reliability or the accuracy of the Cleveland index.

D. *Cleveland Typographical Union, Local No. 53.* A COLA provision was first included in the collective bargaining agreement between PIANO and the Union in 1976. Mr. Haven Combs, President and chief negotiator for Local 53, testified in a deposition that a COLA provision was requested by the Union for several reasons, including a desire to keep members' wages from being eroded by the effect of inflation. Also, other printing unions had been granted COLA provisions, and Local 53 wished to be on a par with such unions.

Mr. Hudeck testified that PIANO proposed basing the COLA provision on the Cleveland CPI–W but was unable to recall why PIANO suggested the Cleveland index rather than the National index. At first the Union proposed a standard International Typographical Union COLA provision, which would have given employees "100 percent of whatever the cost of living was." PIANO flatly refused that proposal, however, and instead offered the COLA provision that finally found its way into the Local No. 53 Contract. Mr. Hudeck did admit that neither party ever questioned the accuracy or reliability of the Cleveland CPI–W.

## IV.

PIANO's suit seeking reformation of the respective COLA provisions in its collective bargaining agreements with the Unions is based on the following argument. PIANO contends that the original intent of both PIANO and the Unions in incorporating a cost of living adjustment into the various contracts was to keep Union members' wages equal to the rise in costs created by general inflationary trends in the economy. The device agreed upon to perform this task was a provision tying cost of living adjustments to an index measuring the changes of consumer prices in the Greater Cleveland area, the Cleveland CPI–W. For a number of years the Cleveland CPI–W fulfilled this purpose. However, since the first half of 1982 the Cleveland CPI–W has failed to serve its intended purpose, namely, that the Cleveland CPI–W measure the increase in inflation in the Cleveland area, thereby providing Union members with a pay increase sufficient to offset the rise in prices. PIANO claims that, for specific reasons, the CPI–W no longer accurately

measures the rise in costs in the Cleveland area and that as a result the payments granted the members under the respective COLA provisions in their contracts represent not a cost of living adjustment, but rather a pay increase, something that the unions were unable to bargain for in contract negotiations. Therefore, arguing that the parties made a mutual mistake in assuming that COLA provisions based upon the Cleveland CPI–W would reflect price increases in the Cleveland area, PIANO states that the parties' intent has been frustrated and requests that the Court grant reformation of the relevant COLA provisions to ones based upon the National CPI–W.[3]

■ A. In order to establish that reformation should be granted in the instant matter, PIANO must show by clear and convincing evidence that a mutual mistake was made by the parties with respect to a material assumption on which the contract was signed and that the equities are such that reformation should be granted. *Spitzer Hardware & Supply Co. v. Denver,* 11 Ohio App.2d 6, 227 N.E.2d 660 (Ct.App. 1967).[4] Thus, to prevail in its suits for reformation, PIANO must prove that both PIANO and the Unions definitely intended that the major purpose of including a COLA provision in their contracts was to keep employees' wages even with inflation

and that the parties formed the assumption that the Cleveland CPI–W would parallel and competently reflect the changes in the cost of living in the Cleveland area. If it is shown that PIANO, in offering the Cleveland index for incorporation into the COLA provisions, assumed the risk that the Cleveland CPI–W would fluctuate in the manner which it has done since 1982, then the court may not grant reformation.[5]

The parties have not cited, and the Court has been unable to find, any Ohio case involving a fact situation similar to the one presented here. Therefore, the Court must attempt to ascertain from Ohio law the most likely outcome and reach the result that it feels would be reached by a state court. *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Since the equitable doctrine of reformation is generally accepted, the Court will draw upon both Ohio law and, to the extent other states' law does not contradict that of Ohio, the better-reasoned decisions from other states.

■ B. The most common circumstance in which reformation is granted is where the parties formed a definite intention with respect to a fact material to the contract and that such an intention failed to be incorporated into the writing signed by the parties through mistake or fraud.[6] Thus,

3. Assuming arguendo that the Court finds that reformation is the appropriate remedy in this instance, it would be by no means clear that in reforming the contracts in question the National CPI–W would be substituted for the Cleveland CPI–W. If the parties' intent was to come up with an index that accurately measured the change in consumer prices in the Cleveland area due to inflation, the Court has not yet been persuaded that the National CPI–W would perform such a task. However, since the parties in the consent order signed on April 25, 1983, Order, *PIANO v. IPGCU, Local No. 56,* C83–127, –128, –129, –130 (N.D.Ohio April 25, 1983), agreed that, in the event PIANO's motion was successful, the National CPI–W would thereafter be used, the Court need not consider the issue.

4. The Restatement (Second) of Contracts § 155, defines the circumstances under which reformation may be granted as follows:
   Where a writing that evidences or embodies an agreement in whole or in part fails to

express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.
Restatement (Second) of Contracts, § 155 (1981).

5. Similarly, the Unions could logically be deemed to have assumed the risk that the Cleveland CPI–W would fluctuate. Were the Unions to seek reformation of the COLA provision if the Cleveland CPI–W fell below the National CPI–W, the Court would therefore deny reformation on the ground of assumption of risk.

6. *See, e.g., Food Handlers Local 425 v. Valmac Indus., Inc.,* 528 F.2d 217 (8th Cir.1975) (dues check-off provision mistakenly removed by scrivener in transcribing negotiations into new contract is incorporated into new contract

in *Hartman v. Tillett*, 86 Ohio App. 20, 89 N.E.2d 613 (Ct.App.1948), Hartman owned three contiguous plots of land and contracted to sell two of the three plots to a party by the name of Vance. In the deed, prepared by Vance's attorney, all three plots were included, but Vance only took possession of the two plots originally discussed. Years later, Vance contracted to sell his land to a third party, Tillett, and the description in the Hartman-Vance was used in this later conveyance. Still later, Hartman and Vance entered into a contract to sell Vance the third plot, at which time they discovered that the third plot had been included in the original deed and thus in the conveyance to Tillett. When Hartman sued Tillett for reformation, the Court granted Hartman's petition, finding that in both the Hartman-Vance conveyance and the Vance-Tillett conveyance all parties thought that only the two plots were being transferred. *See also, Haverstick v. Beaver*, 34 Ohio L.Abs. 363, 37 N.E.2d 650 (Ct.App.1941).

Where, however, the mistaken intention is not shown to be mutual, the courts have been unwilling to grant reformation. If only one party was mistaken in his or her intent, or if the parties' intentions were conflicting, then the court is without the power to order reformation. *Stewart v. Gordon*, 60 Ohio St. 170, 53 N.E. 797 (1899).

> It is not competent for a court to determine the contract that should have been made, and decree its performance. Parties must be left to make their own contracts. The most the court can do, in exercising the power of reformation, is to clearly ascertain what the contract was, and to correct such mutual errors as

have intervened in carrying it into execution.

*Id.* at 176, 53 N.E. 797.

C. The mutual mistake claimed in this case is an error in intending that the Union members would receive a cost of living increase equivalent to the actual rise in inflation rate and in intending and assuming that the Cleveland CPI–W would be a reliable and accurate indicator of the inflation rate. In turn, the finding of mutual mistake rests upon whether the parties' erroneous assumption[7] as to the future path taken by the Cleveland CPI–W is the kind of risk that the Court may deem either of the parties to have assumed. Professor Arthur Corbin has identified the question in cases involving mistake of factors that affect value:

> In these cases, the decision involves a judgment as to the materiality of the alleged factor, and as to whether the parties made a definite assumption that it existed and made their agreement in the belief that there was no risk with respect to it. Opinions are almost sure to differ on both of these matters, so that decisions must be, or appear to be, conflicting. The court's judgment on each of them is a judgment on a matter of fact, not a judgment as to law. No rule of thumb should be constructed for cases of this kind.

3 *Corbin on Contracts* § 605 (1960). The Court must thus determine whether the parties made mutual assumptions about the intent behind the COLA provision and about the future of the Cleveland CPI–W.

In determining this issue, the Court has carefully examined other cases where contracting parties utilized a variable factor in their written agreements. In such cases, two divergent patterns are revealed. In one group of cases courts have concluded

---

through court's power of reformation); *Calhoun v. Bernard*, 333 F.2d 739 (9th Cir.1964) (court reforms "herein" to "therein" to fit parties' intentions).

**7.** The Court notes at this point that plaintiffs have not sufficiently proven that the Cleveland CPI–W fails to accurately reflect the inflation rate in the Greater Cleveland Area. Although

the Court is able to follow the arguments of Dr. Burke, it has not yet been demonstrated to the Court's satisfaction how the distortion of one item in one subcomponent of one of the components of the Cleveland CPI–W results in such a great divergence between the National CPI–W and the Cleveland CPI–W.

that, while the contracting parties utilized a variable rate to lessen the risk that a straight rate might be affected by unexpected changes in the price of a needed raw material or by general economic trends, the parties necessarily assumed the risk that a variable rate might fluctuate and produce a result unfavorable to one of the parties. These courts have reasoned that one party is almost always likely to be disappointed by the future course of events. In *Wabash, Inc. v. Avnet, Inc.*, 516 F.Supp. 995 (N.D.Ill.1981), Avenet arranged to sell Wabash the assets of Avenet's subsidiary IPM under a consent decree worked out with the Federal Trade Commission (FTC). An original agreement, tying yearly payments to a percentage of the subsidiary's future sales over a base amount, failed to gain FTC approval due to the possibility that the arrangement might discourage Wabash, Inc. from maximizing IPM's sales. Thereafter, the parties agreed to, and the FTC approved, a formula tying future yearly payments to the increase in the Gross National Product (GNP). Sometimes later, the Gross National Product rose while the sales of IPM and many other domestic companies fell. Wabash filed suit seeking reformation of the contract claiming that unpredictable and unforeseen economic factors caused the Gross National Product to "fail" to reflect the lack of growth in the American economy and that such failure was a mutual mistake of fact in the negotiation of the agreement.

The court, after trial, noted that the parties had carefully examined all available data, had been satisfied that the GNP formula would work, and had found no mistake as to the reliability [8] of the GNP as an indicator at the time of contracting. Although subsequent events had distorted the correlation between IPM's sales and the GNP, the court found that the possibility of such distortion was inherent given the use of a variable indicator. Since the parties had carefully studied the past history of the GNP as an indicator of sales, the court found no mistake in using the indicator at the time of contracting and found that any future distortion was a risk assumed by the parties. Thus, reformation was refused. *See also, Eastern Air Lines v. Gulf Oil Corp.*, 415 F.Supp. 429 (S.D. Fla.1975); *George Backer Management v. Acme Quilting Co.*, 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978).

PIANO cites *Aluminum Co. of America v. Essex Group, Inc.*, 499 F.Supp. 53 (W.D. Pa.1980) (*ALCOA*) in support of its motion for summary judgment. In *ALCOA*, the parties entered into a sixteen year contract in 1967 under which Essex would supply ALCOA with alumina which ALCOA would then convert into molten aluminum. The price provisions of the contract contained an escalation clause, which was to provide a basis for protecting ALCOA's non-labor costs of production. Under the clause the contract price per pound of aluminum was to rise three cents per pound in accordance with changes in the Wholesale Price Index-Industrial Commodities (WPI–IC). The escalator clause was developed by ALCOA with the aid of the economist Alan Greenspan, who studied the non-labor production costs of ALCOA prior to the formation of the 1967 contract and concluded that the WPI–IC had tracked ALCOA's previous costs and was likely to furnish such a pattern in the future. After finding that the past record of the WPI–IC revealed a pattern of stability, Essex agreed to the clause.

In the early years of the contract, the pricing formula yielded ALCOA the standard net profit that it sought. However, the Arab oil embargo in 1973 caused ALCOA's electricity bills, its major non-labor cost component, to rise more rapidly than the WPI–IC. Therefore, the profit which

---

**8.** PIANO attempts to make much of the fact that in *Wabash* the GNP was accurate on its own but simply failed to correspond to domestic sales, while in the instant case the Cleveland CPI–W is inaccurate. Although the Court understands the distinction between the accuracy of an index and the reliability of the same index as a guide for another factor, the Court does not believe that the distinction bears weight in the majority of cases. The doctrine of assumption of risk concerns a wide number of possible outcomes, and PIANO's argument seems disingenious.

ALCOA had expected to reap under the contract evaporated. In 1978, ALCOA filed suit seeking reformation of the contract on the grounds of mutual mistake. ALCOA argued, as PIANO does here, that the parties intended and assumed that the use of the WPI–IC would create a reliable means to measure the non-labor production costs but that their mutual assumption was in fact proven incorrect.

After trial, the court found that the parties made a mutual mistake as to a fact existing at the time of contracting and not an erroneous prediction, for which relief by reformation would be unavailable. The court held that the parties were mistaken in their belief that, based on past history, the index would provide a reliable guide to non-labor costs. It viewed the clause as one by which the parties took to lessen the risk of cost changes after a careful study of past cost patterns. The court similarly held that, while Essex's intent may not have been to guarantee ALCOA a profit, Essex's intent was not controlling. Having found that Essex assumed that the index would work, the court allowed reformation.

D. This Court is respectfully at odds with the reasoning and result in *ALCOA*.[9] Although an instance may indeed occur in which both parties mutually chose the use of a variable factor on a mistaken assumption that the factor would function in a specific manner and rested their entire agreement on that assumption, courts should be reluctant to grant reformation. The willingness of courts to reform contracts on the basis of subsequent knowledge may undermine the policy of finality which is so essential and revered in contract law. As the court in *Wabash, Inc. v. Avnet, Inc.*, 516 F.Supp. 995 (N.D.Ill.1981), so aptly noted,

> under the logical consequences of *[ALCOA]* there would be no predictability or certainty for contracting parties who selected a future variable to measure their contract liability. Whichever way the

variable fluctuated, the disappointed party would be free to assert frustrated expectations and seek relief via reformation.

*Id.* at 999, n. 6.

■ Even were the Court to fully agree with the *ALCOA* court in its interpretation of the law of mutual mistake with regard to variable factors, it would still be unable to grant the relief sought here by plaintiffs. As previously stated, the finding of mutual mistake sufficient to justify reformation of contract is a finding of fact. Summary judgment is an inappropriate vehicle for the resolution of issues that concern an individual's intentions and thoughts. *Gual Morales v. Hernandez Vega*, 579 F.2d 677, 681 (1st Cir.1978).

A review of the documents presented by the parties reveals that genuine issues of fact exist with respect to the intent of both parties. The Cleveland CPI–W was proposed by PIANO after PIANO refused the COLA provisions offered by the Unions. For a finding of mutual mistake, the Court would have to conclude that the Unions' main intention was to gain for their membership a COLA provision that protected them from inflation and that they believed that the CPI–W would accurately and best measure the rate of inflation in the Cleveland area.

A review of the depositions filed in this matter, however, fails to convince the Court that such was the case. In the Local No. 56 contract, Mr. Boehnlein stated that a major reason for asking for a COLA provision was that other printing unions had a COLA provision and Local No. 56 wanted a similar provision. Obtaining the benefit took precedence over the form the benefit took. The Union's original proposals were repeated by PIANO, who came back with a COLA based on the Cleveland CPI–W. Although the Unions accepted the COLA, it is not clear that the Unions cared about the accuracy of the Cleveland CPI–W. The deposition testimony of the Union

---

**9.** Other courts have noted their misgivings about the result in *ALCOA, see, e.g., In re Westinghouse Electric Corporation Uranium Con-* *tracts Litigation,* 517 F.Supp. 440, 457–58 (E.D. Va.1981); *Wabash, Inc. v. Avnet, Inc.,* 516 F.Supp. 995 (N.D.Ill.1981).

negotiations, presented by PIANO to show that the Unions chose the Cleveland CPI–W in the belief that it would accurately reflect the inflation rate in the Cleveland area, simply fails to conclusively prove that the Unions clearly formed the belief and intent that the Cleveland CPI–W would do exactly that.

It is not indisputedly clear, however, that the Unions' intentions and assumptions were different from those of PIANO in their view of the COLA provisions of the contracts and in the use of the Cleveland CPI–W. As has been previously related, the Unions never questioned the accuracy of the Cleveland CPI–W. Also, in the two Local No. 546 contracts, the Union negotiators deposed were unable to recall the Unions' intent at the time of contracting.

### V.

The equitable powers of a court to grant reformation are exercised only with great care. Rather than to permit reformation on a lesser showing of proof, the Ohio courts have limited the power of reformation to a showing of "clear and convincing evidence." *Guenther v. Downtown Mercury, Inc.*, 105 Ohio App. 125, 151 N.E.2d 749 (Ct.App.1958); *Greenfield v. Aetna Casualty & Surety Co.*, 75 Ohio App. 122, 61 N.E.2d 226 (Ct.App.1944). This high standard has not been met by either party in the instant matter. Courts should be reluctant to grant summary judgment on matters such as the ones presented by this case, in which the conclusive finding of fact will rest upon the intentions of parties to activities that occurred years ago. Although the Court notes its misgivings about the finding of mutual mistake permitting reformation in the circumstances of this case, it withholds judgment until the matter is brought to trial. Therefore, the Court denies the cross-motions for summary judgment on the PIANO's motion to reform the contracts based upon mutual mistake.

### VI.

PIANO has also moved for summary judgment to reform the contracts based upon the doctrine of frustration of purpose. The Restatement (Second) of Contracts defines the doctrine:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or circumstances indicate the contrary.

Restatement (Second) of Contracts § 265 (1981).

Although the Ohio courts do not appear to widely accept the doctrine, *see, e.g., Morris Coal Co. v. Thompson,* 2 Ohio App. 345 (Ct.App.1914), at least one court has so done. In *Bozeman v. Fitzmaurice,* 62 Ohio L.Abs. 526, 107 N.E.2d 627 (Ohio App. 1951), a contract was entered into in 1936 between Local Union 707, a voluntary unincorporated group of employees at General Electric's plants in Cleveland, and the International Union of Electrical Radio and Machine Workers of America, C.I.O. (U.E.). Under the U.E. Constitution, any secession from the U.E. was invalid if seven or more members desired to maintain their affiliation.

Local 707 grew to approximately 3000 members by 1949. That same year, the C.I.O. expelled the U.E. from the Congress of Industrial Organization for what were alleged to be acts of Communism. Thereafter, the Local voted to dissaffiliate from the U.E. and affiliate with the I.U.E., a C.I.O. affiliate. When the U.E. moved to enforce the provision of its constitution, the Local defended by arguing that its predominant purpose of affiliating with the U.E. had been to gain affiliation with the C.I.O., and that once the U.E. was ousted from the C.I.O. the Local's purpose was frustrated.

The Court held that the Local's main purpose in affiliating with the U.E. was to gain affiliation with the C.I.O. and that all obligations and performance due U.E. were excused when the C.I.O. expelled the U.E. from its membership. Although the case

may more aptly be described as a labor rights or voting rights case, this Court will proceed on the assumption that a cause of action in Ohio may be based on frustration of purpose.

A. The Comments to the Restatement § 265 provide useful insight into the factors that must be established to make out a claim of substantial frustration:

> First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. This involves essentially the same sort of determinations that are involved under the general rule of impracticability.

In alleging that it is entitled to reformation due to frustration of purpose, PIANO argues that the principal purpose of the parties in agreeing upon a COLA provision based upon the Cleveland CPI–W was to give the Union members a cost of living adjustment that would parallel the inflation rate in the Cleveland area. PIANO further suggests that this purpose has been frustrated by the occurrence of an event, in this case the divergence of the National and Cleveland indices, that the parties assumed would never occur.

The doctrine of frustration of purpose bears many resemblances to PIANO's claim for mutual mistake. To prove that the purpose of the contract has been frustrated, PIANO must show that neither party assumed the risk that the Cleveland CPI–W would fluctuate either up or down and must also show that the principal purpose of the parties in entering into a COLA provision based on the Cleveland CPI–W was that the parties intended that the Union members enjoy a cost of living adjustment that would accurately and closely reflect the inflation rate in Cleveland.

The evidence forwarded by the parties on mutual mistake, which the Court holds bars the granting of summary judgment due to the fact that different inferences may be made as to the intent and assumption of the parties, is thus also applicable to PIANO's claim for frustration of purpose. Again, it is not clear that the parties' basic assumption was that the Cleveland CPI–W would never fluctuate from the National CPI–W.

B. Regardless of the parties' assumptions, the Court holds that it will not reform the COLA provision on the basis of frustration of purpose since PIANO has failed to meet the second part of the test, that the frustration be substantial.

The courts, in ruling upon claims of frustration of purpose, have declined to construct a single test for substantiality, a policy that makes eminent sense when one considers both the myriad situations in which a claim of frustration of purpose may arise and also the different ways in which substantiality may be expressed. The determination of substantiality sufficient to find that frustration of purpose has occurred is borrowed from the related doctrine of commercial impracticability. If the frustration is not so severe that a court would rule that a contract cannot be fulfilled without undue hardship, then a claim for frustration of purpose is not made out. *See, e.g.,* 6 *Corbin on Contracts* § 1355 (1962).

It is clear that the change in profit or loss sufficient to uphold a claim of frustration of purpose must be great. In *American Trading and Production Corporation v. Shell International Marine Ltd.,* 453 F.2d 939 (2d Cir.1972), the parties entered into a contract of charter for cart-

age of a cargo of lube oil from Texas to India for a contract price of $417,327.36. The normal route of passage from Texas to India was through the Suez Canal, but as the vessel was off shore the entrance to the Suez Canal, the Canal was closed by Egypt as a result of the outbreak of hostilities between Egypt and Israel. The charters were then instructed to proceed back through the Mediterranean Sea and around the Cape of Good Hope to India. Upon completion of the trip the owner billed $131,978.44 as extra compensation for the added 9,000 miles of the trip, effectively doubling the miles covered.

■ The Court, finding that travel via the Suez Canal constituted the normal and customary route for the charter, noted that the increase in expense was less than one-third the agreed-upon contract price and that as such the plaintiff had not made a sufficient showing of unreasonable expense. In another case involving a voyage charter that was forced to re-route around the African continent due to the closing of the Suez Canal, the court held that an increase in expense of $43,972.00 above a contract price of $305,842.92 was insufficient to constitute commercial impracticability. *Transatlantic Financing Corporation v. United States,* 363 F.2d 312 (D.C. Cir.1966).

More recent cases have followed the same line. In *Iowa Electric Light and Power Co. v. Atlas Corp.,* 467 F.Supp. 129 (N.D.Iowa 1978), the parties entered into a four year agreement under which Atlas was to supply uranium concentrate to plaintiff for use in plaintiff's nuclear reactors. As the contract progressed, the price of uranium concentrate soared, threatening Atlas with a significant loss on the contract. Atlas then brought suit, arguing commercial impracticability. The Court found that the cost of completing the contract would be a $2,673,125.00 loss to Atlas, or, calculated differently, 58% over the contract price. Such added expense, either in

terms of absolute loss or percentage increase, the Court held, was not sufficient to make out a claim of commercial impracticability. *Id.* at 140. The court in *Aluminum Company of America v. Essex Corp.,* 499 F.Supp. 53 (W.D.Pa.1980) did, however, hold that a projected loss of $75,-000,000 over the life of a sixteen-year contract constituted the level of loss sufficient to make out a claim for commercial impracticability and frustration of purpose.

With these standards in mind, the Court will now review the evidence in this case. In asserting its claim for frustration of purpose, PIANO claims that the increase in COLA payments incurred as a result of using the Cleveland CPI–W rather than the National CPI–W is 180%. While PIANO is literally correct in that the increase in the Cleveland CPI–W is 180% of the increase in the National CPI–W for the period between April 1982 and October 1982, the Court feels that PIANO misrepresents the actual result and its effect on the parties' bargain.

An examination of the National CPI–W and the Cleveland CPI–W from February 1978 to February 1983 reveals that the difference has ranged from the National CPI–W being 3.0 points greater than the Cleveland CPI–W (June 1978) to 23.0 points lower than the Cleveland CPI–W (December 1982). The swing has at times been rapid—in June 1981 the Cleveland index was 12.4 points higher than the National index, but by December 1981 the Cleveland index was only 0.1 point higher. As of June 1982 the Cleveland index was 6.9 points above the National index. Since that time the Cleveland index has hovered approximately 20 points above the National index.

Another means of comparing the two indices is a study of the wage rates that would be applicable based upon the respective COLA provisions. As of January 1, 1983, the following table is applicable:

| Union Job Classification | Cleveland CPI–W | National CPI–W | Difference | % Increase |
|---|---|---|---|---|
| Bookbinder I | 13.51 | 12.76 | +.75 | 5.9 |
| Bookbinder II | 10.08 | 9.53 | +.55 | 5.8 |
| Compositor-Typesetter | 13.22 | 12.86 | +.38 | 3.0 |
| Film Stripper | 15.52 | 14.80 | +.72 | 4.9 |
| Two Color Pressman (IPGCU) | 14.09 | 13.73 | +.36 | 2.6 |
| Two Color Pressman (GAIU) | 15.95 | 15.23 | +.72 | 4.7 |

Viewed thusly, the wage differentials resulting from the use of the Cleveland CPI–W rather than the National CPI–W range from 36 cents an hour to 75 cents an hour out of a base hourly wage rate of $9.53 to 15.23. These differences, expressed as a percentage of the base wage rate, vary from 2.6% to 5.9%. Such an increase in expense, either in absolute terms or as a percentage, simply does not make out the type of unanticipated expense deemed sufficient to support a claim for reformation based upon frustration of purpose.

PIANO has not met its burden of showing substantial frustration. The contract in ALCOA was to run for sixteen years. At the most, the contracts in dispute here run three years,[10] and PIANO has not proven that it has or will experience severe losses over the terms of the contracts. PIANO does allude to the fact that its labor costs are higher than the costs of its competitors in the region and that such higher costs hamper the ability of PIANO members to compete. PIANO also notes that at least five printing firms have closed within the greater Cleveland area between November 1981 and November 1982 and that several employers have been granted wage concessions and/or a moritorium on COLA payments. While these facts and occurrences should foster careful consideration and negotiation between the parties, they do not make out a case for the substantiali-

ty of frustration sufficient to grant PIANO the relief it seeks. It is hoped that the parties will recognize their own self-interests in their present and future contract negotiations and avoid further plant closings, events which help neither side.

### VII.

Accordingly, the cross-motions for summary judgment filed on PIANO's petition for reformation of contract for mutual mistake are denied. PIANO's motion for summary judgment for reformation based on frustration of purpose is denied.

IT IS SO ORDERED.

---

**10.** The lifespans of PIANO-Union contracts are: (1) Local No. 56, October 1, 1981 to September 30, 1984; (2) Local No. 546 (Lithographers), May 1, 1982 to April 30, 1985; (3) Local No. 546 (Bookbinders), October 1, 1981 to September 30, 1983; (4) Local No. 53, January 1, 1981 to December 31, 1983.