**WABASH, INC., et al., Plaintiffs and Counterdefendants,**

v.

**AVNET, INC., Defendant and Counterplaintiff.**

**No. 79 C 240.**

United States District Court,
N. D. Illinois, E. D.

May 26, 1981.

Stephen C. Sandels, Walter M. Jones, Margaret M. Lauf, McDermott, Will & Emery, Chicago, Ill., for plaintiffs and counter-defendants.

Michael B. Roche, Roger L. Longtin, L. Andrew Brehm, Hubachek & Kelly, Ltd., Chicago, Ill., for defendant and counter-plaintiff.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Plaintiffs Wabash, Inc. ("Wabash") and International Products & Manufacturing, Inc. ("IPM") sue Avnet, Inc. ("Avnet") for breach of warranty, antitrust violations,

trademark infringement, contract reformation and unfair competition. Avnet has moved to dismiss Counts IV, V and VI of the Amended Complaint (the "Complaint").[1] For the reasons stated in this memorandum opinion and order that motion is granted as to Count IV and denied as to Counts V and VI.

## Count IV

On October 8, 1976 Avnet entered into a written contract (the "Draft Agreement") to sell to Wabash substantially all the property, assets, goodwill and business of Avnet's subsidiary IPM. Its sale was pursuant to a Federal Trade Commission ("FTC") ruling (upheld by our Court of Appeals) requiring Avnet's divestiture of IPM.

Initially the parties contemplated a purchase price in the range of $30 million but intended that a portion of the price be contingent on IPM's future success or failure. For that reason the Draft Agreement provided for a guaranteed payment of $22 million plus six yearly payments, each in an amount equal to the greater of (1) $400,000 and (2) 10% of IPM's sales for the applicable fiscal year in excess of $33 million.[2] In no event would the aggregate of the deferred payments exceed $8 million. Both sides anticipated an approximately 10% annual rate of growth in IPM's sales, a rate that would have produced the full $8 million in deferred payments.

FTC refused to approve the Draft Agreement because it considered that linking the purchase price to IPM's sales might discourage Wabash from maximizing such sales (thus creating an incentive for anticompetitive activity). Although FTC recommended establishment of a fixed rather than a contingent price, the parties sought an alternative formula that would preserve their original intention while meeting FTC's concerns about manipulation. After investigating and rejecting a number of government indices they agreed to use the Department of Commerce's Gross National Product ("GNP"). They determined that GNP reflected general economic conditions and had in the past reflected the growth of IPM's sales. Both parties believed GNP was an accurate economic indicator, so that an increasing GNP reflected general economic growth.

On January 13, 1977 the parties entered into their ultimate agreement (the "Agreement"). Its deferred payment provision retained the $8 million maximum and the six year term, but each annual payment was revised to the greater of (1) $400,000 and (2) $5,000 for each 0.1% of the percentage increase in GNP over GNP for the year ending December 1, 1976. After FTC approved the Agreement, the IPM sale was closed February 13, 1977.

Due to "totally unpredictable and unforeseeable" economic factors ("circumstances of the inflationary-recessionary cycle"), GNP continued to rise in 1978 while sales of most U.S. companies, including IPM, began to level off or drop. In 1979 IPM had a negligible increase in sales while GNP increased over 14%. In 1980 IPM's sales fell almost 13% while GNP rose 15%. Plaintiffs estimate that if the disparity continues they will pay the entire maximum $8 million under the Agreement in about five years, while under the Draft Agreement formula rejected by the FTC they would have paid less than $5 million in deferred payments over the entire six-year term. Plaintiffs demand reformation of the Agreement "to express the true intent of the parties."

■ In this diversity action Illinois law provides the rules of decision on all substan-

---

1. For the purposes of Avnet's motion to dismiss all well-pleaded allegations of the Complaint must be taken as true, with all reasonable inferences drawn in favor of plaintiffs. Accordingly all "facts" discussed in this opinion are drawn from the Complaint and expressed in the light most favorable to plaintiffs. Of course no actual findings of fact are to be inferred from the discussion.

2. In addition the Draft Agreement required Wabash to pay Avnet an amount equal to the excess of IPM's net asset book value on the effective date over $18.75 million. That provision was carried forward into the Agreement next discussed in the text and is not in controversy for purposes of Avnet's present motion.

tive issues, including the choice-of-law question as to what state's law applies to the Agreement. Agreement ¶ 17(m) provides that it is to be "governed by, construed, and interpreted" in accordance with New York law. Because Illinois law gives effect to such provisions, *Reighley v. Continental Illinois National Bank & Trust Co. of Chicago*, 390 Ill. 242, 249, 61 N.E.2d 29, 33 (1945), we look to the New York law of contract reformation.

Plaintiffs predicate their request for reformation on a claimed mutual mistake of fact. On the Complaint's allegations the parties intended to draft an agreement under which the purchase price would reflect the progress of economic conditions in general. Plaintiffs contend that the subsequent failure of GNP to reflect the lack of growth in the American economy demonstrates a mutual mistake of fact in the negotiation of the Agreement.

This case does not pose the classical mutual mistake situation in which courts traditionally grant contract reformation. There parties have typically negotiated a contract in reliance on a mistaken perception as to an *existing* fact.[3]

■■■ Here however the parties examined all the available data and were satisfied, at the time of the Agreement, that the GNP formula would work. As a general rule courts (and New York courts are no exception) will not reform a contract that contains a variable term simply because events do not unfold as expected. Thus in *George Backer Management v. Acme Quilting Co.*, 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978) the parties linked lease payments to wage rates to be established by the Realty Advisory Board. Reformation was denied even though increases in the wage rates far exceeded what plaintiff contended were the parties' expectations. As the Court put it in granting

summary judgment (46 N.Y.2d at 219, 413 N.Y.S.2d at 139, 385 N.E.2d at 1066):

> Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties.

*Accord*, applying New York law, *Leasco Corp. v. Taussig*, 473 F.2d 777, 781–82 (2d Cir. 1972).

■■■ New York case law tracks conventional contract doctrine: Parties that enter into clear and unambiguous contracts (certainly the case here) are bound to the terms of those contracts because the law presumes that *intent* conforms to *language*. *Nichols v. Nichols*, 306 N.Y. 490, 119 N.E.2d 351, 353 (1954). Essentially this is the contract counterpart of the reasonable man in tort law: One party will not be heard to assert that it understood the contract language to have a meaning other than its normal one, for that would defeat the reasonable expectations of the other party. In that sense we do not really look at "mutual intent" to define contractual responsibilities, but rather at what a person using the clear contract language will conclusively be deemed to have intended. Only where the intent of *both* parties would be defeated by literal application of such clear language will relief by way of reformation be granted—hence the concept of "mutual mistake of fact."

Plaintiffs themselves recognize the limited play to be accorded the doctrine of reformation on such grounds (Pl. Mem. 6, emphasis added):

> Stated succinctly, when the parties to a contract enter into a contract under a mutual mistake as to a material *existing* fact, the courts can and will reform the

---

**3.** First year law students usually encounter the principle as applied in *Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887). In *Sherwood* the seller was granted relief from the sale of a breeding cow mistakenly believed by both buyer and seller to be barren, but in fact carrying an unborn calf at the time of the contract. Thus the sale price had mistakenly been based on the lower value of the cow for slaughtering purposes.

contract to make it conform to the true intent of the parties.[4]

What they fail to acknowledge however is the impact of that limitation on the allegations of their own Count IV:

12. Upon examining the Commerce Department's Gross National Product Index ("GNP"), the parties determined that GNP, in fact, reflected general economic conditions and had, in fact, reflected the growth of IPM's sales in the past. As such, if GNP continued to increase, IPM's sales would increase accordingly as they had done so in the past. Both Wabash and Avnet carefully examined the past performance of the GNP index before agreeing to its use. Both parties believed that GNP was an accurate economic indicator and that a growing GNP reflected general economic growth.

* * * * * *

14. The assumption that the GNP index was an accurate economic index was basic to the contract. The parties arrived at an agreeable purchase price dependent upon this assumption. Following amendment, the Agreement was approved by the Federal Trade Commission and on February 11, 1977, Wabash and Avnet closed on the sale of IPM.

■ Nowhere do plaintiffs assert that what the parties mutually "determined" (the first sentence of Paragraph 12) or "believed" (the fourth sentence of Paragraph 12) or their mutual "assumption" (the first sentence of Paragraph 14) was mistaken *at the time of contracting*. Indeed Paragraph 15 of Count IV characterizes the *future* operation of GNP ("future" in the sense that the phenomenon of its failing to parallel the sales trend admittedly began over one and one-half years after the Agreement was executed) as "totally unpredictable and unforeseeable." That completely negates the notion of a mistake as to a material "existing" fact. So the concept that the Complaint's well-pleaded allegations are accepted as true defeats rather than establishes plaintiffs' claim.

This Court will rewrite neither the Agreement nor plaintiffs' Complaint. On plaintiffs' own allegations the situation is no different from that in *Backer*. There the tenant sought to reform the lease because the rent increases under the formula substantially exceeded what the parties had expected. Thus in *Backer* as under plaintiffs' allegations here, the index agreed upon by the parties did not work as the contracting parties had anticipated when they executed their contract. Rejection of reformation in *Backer* requires a like rejection of reformation of the Agreement as drafted, under Count IV as drafted.[5]

Plaintiffs might possibly have framed the Complaint's allegations in a way that would conform to the requirement of a mutual mistake of *existing* fact and thus survive a motion to dismiss.[6] They are however represented by responsible and skillful counsel, and their pleadings will be taken as framed. Count IV is dismissed.

---

4. That is precisely the thrust of every case on which plaintiffs seek to rely, except for the decision in *Aluminum Co. of America v. Essex Group, Inc.*, 499 F.Supp. 53 (W.D.Pa.1980). Plaintiffs' string citations, addressed as they are to a situation wholly different from that alleged by plaintiffs themselves, therefore evaporate as claimed support for Count IV.

5. Because this is a diversity case the Court cannot elevate the District Court decision in *Aluminum Co. of America*, which applied Indiana law and does support plaintiffs' position, over the New York case law. Even were this Court free to do so, it would not. Under the logical consequences of that case there would be no predictability or certainty for contracting parties who selected a future variable to measure their contract liability. Whichever way the variable fluctuated, the disappointed party would be free to assert frustrated expectations and seek relief via reformation. Much the same thought was expressed in *Backer*, 46 N.Y.2d at 219, 413 N.Y.S.2d at 139, 385 N.E.2d at 1066 (citation omitted):

And well that it is, for freedom to contract would not long survive courts' ready remaking of contracts that parties have agreed upon.... All the more so when a litigant seeks to invoke the power of the court, not merely to sever the contractual relationship between the parties, but, as here, to continue that relationship in a modified form.

6. Had they done so, of course, their proof requirements would have been correspondingly more difficult for them to meet.

*Counts V and VI*

Counts V and VI concern the alleged misappropriation of confidential information by Avnet. Joseph Brusseau ("Brusseau"), an IPM employee before IPM was purchased by Wabash, was promoted to IPM President after the purchase and held that position until terminated December 5, 1977. Wabash asserts that after the claims set forth in Counts I, II and III of the Complaint were presented to Avnet, but before this action was filed, Avnet induced Brusseau to disclose confidential information as to the nature of Wabash's claim and the possibility of litigation. Count V seeks compensatory damages for the harm caused by the allegedly unlawful inducement and misappropriation of the confidential information (it also prays for injunctive relief against further solicitation of confidential information), and Count VI seeks punitive damages because Avnet's alleged misdeeds were willful and wanton.

Counts V and VI are tort claims, and under Illinois choice-of-law principles this Court must apply the law of the state with the most significant relationship to the tort. *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970). Both plaintiff corporations have their principal places of business in Illinois, while defendant corporation has its in New York. Brusseau is an Illinois resident who worked for plaintiffs in this state. Brusseau's alleged misappropriation of the information thus occurred in Illinois. Given the Illinois center of gravity of the claimed tortious activity, its substantive law must be looked to.

Avnet urges that this Court read Brusseau's employment and termination contracts closely and find that the information referred to in Counts V and VI was not of the type prohibited from disclosure by those contracts. That may well be true, but the Complaint charges inducement of a breach of Brusseau's *fiduciary* duties as well as a breach of contract. Even absent a breach of the contract of employment or the contract of termination, Brusseau owed a duty of loyalty to IPM. *ABC Trans National Transport, Inc. v. Aeronautics Forwarders,* *Inc.*, 62 Ill.App.3d 671, 20 Ill.Dec. 160, 379 N.E.2d 1228 (1st Dist. 1978). Avnet cannot therefore obtain dismissal of the two Counts on a narrow reading limited to the contract provisions.

 One essential element of the cause of action asserted by Avnet in Counts V and VI is of course damage to Avnet. *Mitchell v. Weiger*, 87 Ill.App.3d 302, 42 Ill.Dec. 543, 545, 409 N.E.2d 38, 40 (1st Dist. 1980). Plaintiffs allege three injuries resulting from Avnet's actions:

(1) the costs of the entire litigation with Avnet;

(2) the salary paid to Brusseau during the period of the wrongdoing; and

(3) "other substantial losses."

Though a motion directed to the pleadings is not the appropriate occasion to deal definitively with the issue of damages, a few comments may be constructive in shaping the future course of the litigation. As for their first claimed injury, plaintiffs have failed to allege any reason that Avnet's misappropriation of the confidential information was either responsible for, or in any way expanded, this litigation. In fact, they have failed to allege any harm at all resulting from such misappropriation.

 Plaintiffs have, however, stated a potentially valid claim for recovery of Brusseau's salary. If Brusseau breached his duty of loyalty to IPM he would not be entitled to compensation during the period of the breach. *Whitney v. Fred D. Jones Co.*, 174 Ill.App. 116 (1st Dist. 1912). Avnet, by inducing the breach and conspiring with Brusseau, could be liable for recovery of that compensation.

In any event, questions of liability are for the future. For now it is sufficient to sustain Counts V and VI against Avnet's motion.

*Conclusion*

Count IV of the Complaint is dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Avnet's like motion as to Counts V and VI is denied, and Avnet is ordered to

answer those Counts on or before June 8, 1981.