**PRINTING INDUSTRIES ASSOCIATION OF NORTHERN OHIO, INC., et al., Plaintiffs,**

v.

**GRAPHIC ARTS INTERNATIONAL UNION, LOCAL NO. 546, et al., Defendants.**

**Nos. C83–127 to C83–129.**

United States District Court, N.D. Ohio, E.D.

Nov. 5, 1985.

---

Michael T. McMenamin, Nancy Noall, Cleveland, Ohio, Carl A. Zellers, Westlake, Ohio, Martin T. Wymer, Irwin Haiman, Cleveland, Ohio, for plaintiffs.

Stanley D. Gottsegen, Cleveland, Ohio, for defendants.

### MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

As agreed by the parties at an in-chambers conference on June 11, 1985, this matter is before the Court for final disposition based upon the present record. For the reasons outlined below, the Court grants judgment in favor of defendants.

### I.

### PROCEDURAL HISTORY

On January 7, 1983, plaintiffs Printing Industries Association of Northern Ohio,

Inc. ("PIANO") filed complaints in the above-captioned actions against four unions representing printing industry employees in the Greater Cleveland area. Plaintiffs are a multi-employer bargaining association and the individual member employers who comprise that association. Plaintiffs sought declaratory judgment and reformation of contract. Specifically, plaintiffs sought reformation of a cost-of-living allowance ("COLA") provision that appeared in two separate collective bargaining agreements entered into between PIANO and defendant Unions. Although the collective bargaining agreements were negotiated by PIANO, each of the individual employers were signatories to the agreements. The gravamen of plaintiffs' Complaint is that the COLA provision in the collective bargaining agreements should be reformed such that the wage adjustment would be based on the *national* consumer price index ("CPI") rather than on the *Cleveland* consumer price index, the latter being the one provided for in the agreements.

Before the Court could rule on defendants' March 22, 1983 preliminary injunction motion, the parties entered into a consent agreement. Pursuant to that consent agreement, which was approved and ordered by the Court on April 25, 1983, the four cases were consolidated. In addition, the Court ordered on April 25, 1983 that each plaintiff-employer pay its employees COLA wage adjustments based upon changes in the National CPI-W during the term of the contracts in dispute. The employers were also ordered to place in an escrow account funds sufficient to cover the difference between wage adjustments based upon the National CPI-W and the Cleveland CPI-W; plaintiffs were to continue depositing this disputed amount in escrow until the Court entered a final order in the consolidated cases. Order, *PIANO v. International Printing and Graphic Communications Union, Local No. 56*, 578 F.Supp. 555 (N.D.Ohio, 1983).

Following this Court's ruling of July 13, 1983 that reformation of collective bargaining agreements was not within the jurisdiction of the arbitrator under the arbitration clauses of the collective bargaining agreements, the parties filed cross-motions for summary judgment. On January 27, 1984, the Court denied the cross-motions for summary judgment. Memorandum Opinion and Order, *PIANO v. International Printing and Graphic Communications Union, Local No. 56*, 584 F.Supp. 990 (N.D.Ohio, 1984).

Between January 1984 and April 1985, the parties undertook negotiations for new collective bargaining agreements which would go into effect upon the expiration of the agreements in dispute in the instant cases.[1] In the course of those negotiations, the parties to C83–130, PIANO and Local No. 53, settled their dispute and stipulated to a dismissal. Negotiations did not prove fruitful in resolving the disputed issues in C83–127, –128 and –129. Although a new agreement covering Local No. 546 (Bookbinders) was negotiated for the period October 1, 1983 to September 30, 1985, it contains a COLA provision different from the ones at issue in this case. The Court has not yet received the stipulated dismissal in C83–127, although such a dismissal was alluded to in the Notice of Withdrawal of Counsel on page 2, filed May 17, 1985.[2]

---

1. The collective bargaining agreements at issue in this litigation cover the following periods:
   (1) C83–127: Local No. 56—Oct. 1, 1981 to Sept. 30, 1984;
   (2) C83–128: Local No. 546 (Lithographers)—May 1, 1982 to April 30, 1985;
   (3) C83–129: Local No. 546 (Bookbinders)—Oct. 1, 1981 to Sept. 30, 1983;
   (4) C83–130: Local No. 53—January 1, 1981 to December 31, 1983.

2. On May 17, 1985, Walter, Haverfield, Buescher & Chockley ("WHB & C") notified this Court of its withdrawal as counsel of record for each of the plaintiffs in the above-captioned actions. WHB & C stated that a conflict of interest had arisen such that the interests of the plaintiffs, which had been identical at the commencement of the lawsuit, were diverging. Specifically, plaintiffs noted that the smaller printing companies with up to 10 employees had different collective bargaining goals than the "large" shops with 30 or more employees. Notice of Withdrawal of Counsel and Motion for Continuance, filed May 17, 1984, at 4, 6. On May 17, 1985,

On June 18, 1985, plaintiff Bedford Lithograph Company, with the consent of both the bookbinders and lithographers units of Local 546, moved this Court for a voluntary dismissal with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). On June 19, 1985, plaintiffs PIANO and the remaining employers filed a brief in opposition to Bedford's motion for dismissal. On September 4, 1985, plaintiffs PIANO and the remaining employers withdrew their opposition to the dismissal though expressly reserving their rights under the National Labor Relations Act. On October 29, 1985, the Court ordered the voluntary dismissal of Bedford Lithograph *nunc pro tunc*. On September 19, 1985, plaintiff Lith-o-Kraft Plate Company stipulated and the Court ordered its voluntary dismissal with prejudice. On September 24, 1985, plaintiff Emerson Press, Inc. was also voluntarily dismissed with prejudice pursuant to a stipulation. The dismissals covered all claims made pursuant to the collective bargaining agreements at issue in C83–127, –128 and –129.

## II.

Jurisdiction of this action is based on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* Plaintiff has its principal place of business in Westlake, Ohio; defendant has its principal place of business in Cleveland, Ohio. Defendant is the exclusive bargaining representative for those employees who work in union pressrooms "and who are engaged in the operation of gravure, offset and letter-press printing presses and their associated devices, offset platemaking, darkroom work, stripping, opaquing, layout and platemaking." Amended Complaint at 4.

PIANO has represented various printing companies in Cleveland over the past 30 years. *Id.* at 5. On October 1, 1981, PI-ANO entered into a collective bargaining agreement with the Union. The contract expired on September 30, 1984. Although the contract provided for a grievance and arbitration procedure in Part IV, the arbitrator's powers were limited such that he "[would] not have the authority to render a decision which will add to, subtract from, or modify the specific provisions of this contract."

Part XXVIII of the contract provided for semi-annual wage adjustments based upon corresponding changes in the Consumer Price Index Revised for Urban Wage Earners and Clerical Workers, 1967–100, new series *for Cleveland, Ohio.* Amended Complaint at 6. Similar wage adjustment provisions to compensate workers for inflation were included in contracts between the parties since 1972 and have been based upon the Cleveland CPI–W.

Plaintiffs contend that computation by the Bureau of Labor Statistics of its indices results in a "distortion" since "the Cleveland CPI–W is based upon a smaller sample, and hence is more prone to statistical distortion." Amended Complaint at 11. While conceding that the indices are based on price changes of the same 400 representative items within the seven major components of the CPI–W, plaintiffs state that "the distinction between the Cleveland CPI–W and the National CPI–W lies in the number of times a particular item is sold or traded, which is obviously less frequently for the Cleveland CPI–W than the National CPI–W." *Id.* Plaintiffs are most concerned by the fact that since June 1982 the Cleveland CPI–W has exceeded the National CPI–W. For example, the Cleveland CPI–W exceeded the National CPI–W by 17.9 points in August 1982 and 20.5 points in October 1982. *Id.* at 12. Plaintiffs note that between October 1981 and April 1982 the mean variance was 1.7 points above the National CPI–W and 3.7 points above for

---

the Court noted WHB & C's withdrawal and ordered each of the plaintiffs to retain separate counsel while retaining WHB & C as trial counsel. Trial was continued until May 28, 1985 at 10:00 a.m. At the Conference held in Chambers

on June 11, 1985, the parties agreed to forego a trial-in-court and instead submit the case to the Court for decision on the record already compiled.

January 1978 and April 1982. *Id.* at 11. Plaintiffs attribute this "substantial and unprecedented deviation" to Cleveland's depressed housing market and smaller sampling. Plaintiffs also extend the depressed economic conditions theory to explain distortions in the other components upon which the CPI–W are calculated. *Id.* at 12. Plaintiffs assert that a disproportionate weight is placed upon the housing component of the index and the false assumption that home ownership costs in the Greater Cleveland area have increased dramatically compared to home ownership costs nationally.

Plaintiffs argue that the contract should be reformed since a "mutual mistake of the parties" occurred. Plaintiffs contend that the parties "believed that the Cleveland CPI–W was specifically reflective of the increases or decreases in the cost of living in the Greater Cleveland area due to inflation." *Id.* at 14. This unprecedented distortion in October 1982, however, would result in a 56-cent-per-hour increase for employees covered by the collective bargaining agreement, or 36 cents more per hour than they would be entitled to under the National CPI–W. The plaintiffs contend that if the employees receive this "windfall," *id.* at 15, the individual member employers will sustain "severe financial hardship," including the inability to be competitive with shops not required to pay Cleveland COLA's, the impairment of operations, and substantial layoffs. *Id.* at 16. In Count II of their Complaint, plaintiffs allege that payment of COLA's at the Cleveland CPI–W would frustrate the purpose of the collective bargaining agreement. *Id.* at 19–20. The Complaint states that "neither party assumed the risk that the Cleveland CPI–W would not, at some point, accurately reflect changes in the cost of living in the Greater Cleveland area due to inflation...." *Id.* at 21.

A brief explanation of the consumer price indices at issue is worthwhile at this point. The U.S. Bureau of Labor Standards ("BLS"), a division of the U.S. Department of Labor, compiles and calculates an "All Cities" Consumer Price Index

known as the National CPI–W. The index is designed to measure changes in prices of goods and services purchased by urban wage earners and clerical workers throughout the United States. Using a base reference index of 100.0 for 1967, the index is calculated from studies of the price changes of 400 items. These 400 items are grouped into seven major categories: food and beverages; housing; clothing or apparel; transportation; medical costs; entertainment; and other. Prices are surveyed in the urban portions of 39 major metropolitan areas and 17 smaller cities at approximately 18,000 retail and service establishments.

The BLS also compiles, calculates and publishes indices for 28 individual urban areas, including Cleveland, Ohio. The Cleveland index is based upon the price changes in the same 400 items comprising the national index. Since the Cleveland CPI–W is based upon a smaller number of sales of each item, it is more likely to be statistically distorted. The Cleveland CPI–W is published bi-monthly.

### III.

### MUTUAL MISTAKE

The Court's primary objective in this matter is to reach conclusions of fact. Given the duration of these lawsuits and the treatment of the legal principles at issue in this Court's summary judgment opinion of January 27, 1984, all that remains is for the Court to make those conclusions of fact about the parties' intentions that it refused to make in January 1984.

To recapitulate, in order to obtain reformation of the contract, plaintiff must show by clear and convincing evidence that a mutual mistake was made by the parties, specifically that "both PIANO and the Unions *definitely intended* that the major purpose of including a COLA provision in their contracts was to keep employees' wages even with inflation and that the parties formed the assumption that the Cleveland CPI–W would parallel and com-

petently reflect the changes in the cost-of-living in the Cleveland area." Summary Judgment Opinion and Order, Jan. 27, 1984, at 10. Concomitantly, PIANO must show that it was not deemed to have assumed the risk for variances in the Cleveland CPI–W in order to obtain reformation. *Id.* If only one party was mistaken or if the parties' intentions were conflicting, then the Court may not order reformation. *Id.* at 11. As the Court noted, quoting Professor Corbin, in determining the intent of the parties as it relates to mistake, "[t]he Court's judgment on each of them [the factors used in coming to an agreement] is a judgment on a matter of fact, not a judgment as to law." *Id.* at 12. Hence, this Court must determine as a conclusion of fact that the Unions' main intention was to gain for their membership a COLA provision that protected them from inflation and that they believed that the Cleveland CPI–W would accurately and best measure the rate of inflation in the Cleveland area.

At the time of the summary judgment opinion, the Court noted that the deposition testimony failed to prove conclusively that the Unions cared about the accuracy of the Cleveland CPI–W. "Obtaining the benefit [the COLA provision which other unions had] took precedence over the form the benefit took." *Id.* at 16. The Court also noted, however, that it was not "indisputably clear" that PIANO and the Unions' intentions diverged. The Court will review that testimony in order to reach a conclusion. Mr. George Bockman, president of Local 546, testified that he was the chief negotiator and spokesman for the Union in arriving at the collective bargaining agreement that became effective May 1, 1982. Deposition of George Bockman on Feb. 23, 1983 (filed March 18, 1983) [hereinafter "Bockman"], at 4–5. Bockman was involved in negotiations which resulted in the contract for May 1973 to April 30, 1976 in which the cost-of-living clause appeared for the first time. He stated that the union had proposed the COLA. Bockman at 13. When asked about the purpose of that provision, he responded over his counsel's objection:

The main thrust of it was the membership and us felt that we were falling behind in cost-of-living because we had no adjustments in the cost of living going up... Right [the main purpose was essentially to keep the members' real wages from being eaten away by inflation].

*Id.* When asked why the Cleveland CPI–W was used instead of the National CPI–W, he stated:

The only way I can answer that, being so long ago, is we were all new to the cost of living, both sides, and so when we finally agreed that they were going to put a cost of living in, I'm just guessing because I'm not sure, and I don't know who asked or why it was asked for, if it was asked even, that which index are we going to use, and our International Vice President was in at that time, and he did most of the talking, because he knew more about cost of living than we did and his expertise was far superior to ours.

All I can remember, very vaguely, is Neil Johnson, Carl's [Carl Zellers, president of PIANO] predecessor, and he said they wanted the Cleveland index, and that was it. Just the company wanted the Cleveland index. So there was no argument on that, as I recall anyway. We wanted the cost of living no matter what, and that was it, as I can remember. That's the best I can remember.

Bockman at 13–14.

He responded that it was his "estimated guess," although unsubstantiated, that the parties thought the Cleveland index would more accurately reflect the cost-of-living in Cleveland than the National CPI–W. *Id.* at 14. He continued that PIANO presented the language of the cost-of-living clause, that "it was presented to us by them," *id.* at 15, and that he didn't understand the language of the provision, "even to this day." *Id.* Still, neither side questioned the reliability or accuracy of the Cleveland CPI–W prior to October 1982. *Id.*

Robert Hudek, secretary-treasurer of Local 546, was the chief union spokesman on

behalf of the bindery employees that resulted in the agreement dated October 1, 1985. Deposition of Robert Hudek, dated February 23, 1983 (filed March 18, 1983) [hereinafter "Hudek"], at .4–5. When asked what the "union's purpose in asking to retain in [sic] the existing contract the cost-of-living adjustment provisions," Hudek answered "to keep the people's wages where they were with inflation . . . so they didn't lose any money." Hudek at 17–18. Hudek confirmed that neither side proposed to replace the Cleveland CPI–W with the National CPI–W and that in October 1982, two meetings were held to discuss the Cleveland CPI–W. *Id.* at 19.

■ This Court concludes that, in the strictest sense, a mutual mistake occurred. The language concerning the Cleveland CPI–W was proposed by PIANO and agreed to by the Unions. The Unions' intent, understandably, was to protect their members against loss in their real wages due to inflation. When PIANO refused the COLA provisions offered by the Unions, the Unions accepted PIANO's CPI–W. Similarly, both parties accepted the use of the Cleveland CPI–W, as proposed by PIANO, on the assumption that it would most accurately measure the inflation rate in the Cleveland area. In the absence of testimony from the Union's "international vice-president" referred to in Mr. Bockman's deposition at 14, it is clear that the Union negotiating team had not conducted any intensive economic or statistical study into the relationship between the National and Cleveland CPI–W. Indeed, it appears that neither party had in 1973 or at any time prior to October 1982 considered divergence between these indices. While a Court always hesitates to draw conclusions about intent based on faulty or incomplete memories of events occurring years in the past,[3] it is probable that the Union relied on the Cleveland CPI–W.

Having found a mutual mistake, the Court must decide whether the mistake here compels reformation of the contract. As discussed in the Summary Judgment Opinion at 12–15, the Court has struggled between those cases in which mutual mistake as to a variable rate forces reformation, the so-called *ALCOA* line of cases (referring to *Alcoa v. Essex Group, Inc.,* 499 F.Supp. 53 (W.D.Pa.1980)), and those cases in which courts have found that the parties necessarily assumed the risk of fluctuations in a variable rate. *See, e.g., Wabash, Inc. v. Avnet, Inc.,* 516 F.Supp. 995 (N.D.Ill.1981).

At this time, the Court holds that the variance between the Cleveland CPI–W and the National CPI–W was a risk assumed by the parties. In the instant case, the fluctuation is unfavorable to plaintiff-employers, but it could have redounded as well to the detriment of the Unions. This Court will not order the reformation of a contract simply because subsequent information has revealed that an index upon which both parties relied and which had been accurate over a period of years suddenly changed. The finality of contract and the certainty of the parties would be subject to the variability of fluctuations and "whose ox was gored." *See Wabash, Inc. v. Avnet, Inc.,* 516 F.Supp. 995, 996 n. 6 (N.D.Ill.1981). One can only speculate whether PIANO and the employers would call for reformation as a contract principle in the instant case if the divergence had resulted in the Cleveland CPI–W being lower than the National CPI–W.

Accordingly, this Court refuses to grant reformation of the relevant COLA provisions in the collective bargaining agreements based on mutual mistake; plaintiffs' request for reformation is denied.

### IV.

### FRUSTRATION OF PURPOSE

■ To this point, the Court has *assumed arguendo* that the divergences be-

---

**3.** The Court could, of course, hold that plaintiff had failed to meet its standard of showing mutual mistake by "clear and convincing evidence." To do so, however, would not only make it virtually impossible for a party to prevail where intent was an issue but would distort what are probable and logical assumptions on the part of both parties in the instant case.

tween the Cleveland CPI–W and the National CPI–W alleged by plaintiff are indeed true. To the extent that plaintiffs seek reformation of the collective bargaining agreements based on frustration of purpose, however, plaintiffs must establish that (1) the divergence did in fact occur and "the non-occurrence of the frustrating event [was] a basic assumption on which the contract was made;" (2) the purpose frustrated was a "principal purpose" of that contract; and (3) the frustration must be "substantial." *See* Restatement (Second) of Contracts § 265 (as cited in Summary Judgment Opinion at 17, 19).

Noting that the inquiry as to elements 1 and 2 of the above test have largely been addressed in the preceding section on mutual mistake, the Court will examine whether the divergence alleged did in fact occur and whether it is substantial.

Plaintiffs have resubmitted for the purposes of final adjudication the expert report of Dr. John F. Burke, Jr. which was originally considered in the motion for summary judgment. Dr. Burke, an associate professor of economics at Cleveland State University, states in his Report that in the short-run the National and Cleveland CPI–W indices can diverge and that "the two indexes can take obviously different routes in getting to similar ends." Report at 1–2. Dr. Burke concludes, "however, that any, even "seemingly minor" or "abnormal" deviations of the relevant metropolitan CPI index from the national all-city average will have a significant impact on wage adjustments." *Id.* at 2. Finally, Dr. Burke contends that "changes in wages compound over time," such that minor adjustments would be incorporated into subsequent wage increases. *Id.* at 3. The ultimate result, concludes the professor, is that as these printing firms are forced to increase their labor costs, they will become less competitive within their industry. *Id.* at 4.

Dr. Burke identifies the divergence between the indices not only to the smaller sampling field of the Cleveland CPI–W but to one specific component, housing. The housing component consists of three subcomponents: fuel, household furnishings, and shelter. The shelter subcomponent is further divided into rent, other rent, and home ownership. Burke Affidavit at 7. According to Dr. Burke, between April and August 1982, the average price of a house increased in the Cleveland area while the average price of a house declined nationally during the same period; thus, the home ownership subcomponent of the Cleveland CPI–W index rose while the same component in the National CPI–W declined. Burke Affidavit at 7. He states, however, that the actual price of a home in Cleveland did not increase, but that "a sampling error resulting from insufficient home sales in the Greater Cleveland area" occurred. *Id.* at 8. "When there are not sufficient home sales to justify computing an index for the home ownership item of the shelter subcomponent, the sample is expanded to other regions and the traditional geographic boundaries of the Cleveland CPI–W are disregarded in order to obtain the requisite number of home sales thereby producing a complete sample." *Id.* at 8. As a result, argues Dr. Burke, BLS considered sales prices higher than the normal sample, which produces a higher homeownership subcomponent, which in turn increases the entire CPI–W. Plaintiffs indicate that in January 1983, BLS issued a news release which recognized and warned of the sampling errors in local CPI indices and urged use of the national CPI. *Id.* at 10.

Defendant has offered the testimony of Professor Andrew Gross. The Court, however, is unable to assess the credibility of the proferred testimony, since defendant has not presented the professional credentials of the professor. The report of Professor Gross was filed with the Court on May 17, 1985 and was, therefore, not originally considered in the Summary Judgment Opinion. The Court will consider Professor Gross' testimony not for the truth of the matter asserted (since its credibility cannot be determined) but for the importance of the issues asserted as they bear on the question of the divergence in the indices in this matter.

Professor Gross recognizes the larger sampling variability of the Cleveland CPI–W but states that "[t]he CPI–W for Cleveland is still the best measure of the Cleveland area situation." Gross Report at 11. Furthermore, Gross states that the BLS's practice of expanding the sampling area to surrounding regions when the original sample is too small is "valid." He states that these "'imputed' or 'collapsed' models are used widely...." *Id.* at 11. He contends that whatever distortions are caused by examining a large area do not invalidate the Cleveland CPI–W, since "the surrounding area tends to move in a similar fashion to the Cleveland metropolitan area." *Id.* at 11. Professor Gross also contends that the sources presented by Dr. Burke are "anecdotal" and are "statistically insufficient" to lead to the conclusion that the CPI–W housing component was distorted. *Id.* at 12.

Above all, Gross concludes that "there is no consistent or persistent 'distortion' between the Cleveland CPI–W and the National CPI–W. *Id.* at 13. He notes that the Cleveland CPI–W has been above and rising more rapidly than the National CPI–W for years, *id.* at 8, but that examinations of the divergence both on a month-to-month and year-to-year basis reveal "no meaningful distortion or discrepancy" between the indices. *Id.* at 14. Gross found that the 1984 CPI–W was only 1.9% above the 1983 CPI–W whereas the 1984 National CPI–W was 3.4% over the 1983 index. *Id.* at 10, 13. Hence, he concludes that "the Cleveland index is only *very slightly* above the U.S.A. figure and furthermore, the annual percent increase for Cleveland was *significantly less* (1.9% v. 3.4% increase). *Id.* at 10 (emphasis in original).

The Court is not equipped to determine whose statistical or economic analysis is correct and will therefore not do so. To quote the aphorism and invert it somewhat, "There are truths, half-truths and then statistics." It is clear, however, that to be substantial, the change in profit or loss must be great. The detriment to the complaining party must not simply be

one of hardship but near commercial impracticability. Summary Judgment at 20. The Court reiterates that while there is an 18% increase in the Cleveland CPI–W when compared to the National CPI–W for April 1982 through October 1982, and that the Cleveland CPI–W has been approximately 20 points above the National CPI–W for that period, the actual effect on wages is not as substantial as plaintiff contends. As noted in the Summary Judgment Opinion at 22, the wage adjustments using the Cleveland CPI–W rather than the National CPI–W are from 36 to 75 cents per hour (depending on the contract involved). "These differences, expressed as a percentage of the base wage rate, vary from 2.6% to 5.9%." Summary Judgment at 22. The Court does not regard such increases to be sufficient to meet the showing of substantial frustration. The threat of the employers of PIANO becoming non-competitive within their industry is speculative, and the Court declines to reform these contracts based on such speculation. Furthermore, to the degree that the contracts at issue in this litigation have expired, the parties may enter subsequent collective bargaining negotiations wiser and may be more willing to obtain contract provisions which not only protect the wage-earners' interests but those of the PIANO employers and the printing industry. It appears certain that the parties are at least now aware of the validity of the Cleveland CPI–W and, based on the BLS's January 1983 warning, will draw future contracts appropriately. This Court does not believe, however, that the hardship exacted on plaintiffs by virtue of the fluctuations in a government index are substantial enough to warrant *post-hoc* reformulation of contracts.

## V.

For the reasons stated above, the Court denies plaintiffs' prayer for reformation of contract based on mutual mistake. As to Count II of the Amended Complaint, the Court denies plaintiffs' prayer for reformation of contract based on frustration of purpose. Hence, the COLA provisions in

Part XXVIII of the Collective Bargaining Agreement dated October 1, 1981 will remain intact in their reference to the Cleveland CPI–W. To effect this finding, the funds placed in escrow accounts pursuant to the Order of April 25, 1983 representing the difference between wage adjustments paid using the National CPI–W and the Cleveland CPI–W will be released and distributed to defendants pursuant to the terms of the original collective bargaining agreements.

Judgment shall be entered for defendant.

IT IS SO ORDERED.